**Mark BRINKMAN et al., Plaintiffs,**

**v.**

**John J. GILLIGAN et al., Defendants.**

**Civ. A. No. C–3–75–304.**

United States District Court,
S. D. Ohio, W. D.

Dec. 15, 1977.

Richard Austin, Dayton, Ohio, Louis R. Lucas, Memphis, Tenn., for plaintiffs.

David C. Greer, Leo F. Krebs, Dayton, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

### I

### INTRODUCTION

This matter is once again before the Court pursuant to the mandate of the Supreme Court of the United States. The nature of that mandate is such that although five years and four appeals have intervened, all evidence presented must be reexamined in light of a standard enunciated by the Supreme Court, and plaintiffs' cause of action must be reconsidered *ab initio.*

In accordance with instructions of the Supreme Court[1] an evidentiary hearing commenced November 1, 1977. Plaintiffs were given an opportunity to enlarge upon the existing record by the presentation of additional evidence and testimony. Eleven witnesses were called during four days of testimony. Following the hearing the Court reexamined in full the record developed at the initial hearing of this matter in November, 1972.

The course of this protracted litigation has been marked by conceptual differences not only as to the facts, but as to the legal significance of those facts. If the passage of five years has moved us no closer to a resolution of this case, it has finally produced a more precise framework by which violations and remedial measures under the Equal Protection Clause of the Fourteenth Amendment may be determined.

The Court finds it essential to describe this framework at the outset of this Order in order that the Findings of Fact may be evaluated by the appropriate legal principles.

Prior to 1976 there was support for the proposition that a violation of the Equal Protection Clause could be proved by a mere showing that actions of state officials had a segregative or discriminatory effect, regardless of their intent. *See Kennedy Park Homes Association v. Lackawanna,* 436 F.2d 108, 114 (2d Cir. 1970) *cert. denied* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); *Hawkins v. Town of Shaw,* 437 F.2d 1286 (5th Cir. 1971), *aff'd on rehearing en banc,* 461 F.2d 1171 (5 Cir. 1972)[2].

Recognizing that some of the language in the earlier cases (particularly *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), and *Wright v. Council*

---

1. "All parties should be free to introduce such additional testimony and other evidence as the District Court may deem appropriate." *Dayton Board of Education v. Brinkman,* 433 U.S. 406 at page 420, 97 S.Ct. 2766, at page 2775, 53 L.Ed.2d 851 (1977).

2. This clearly was plaintiffs' view in their pretrial brief filed prior to the first hearing in this case: ". . . The law of the land with respect to school cases now is clearly not the intent but rather the effect of 'state action.' ". Pretrial Brief, filed November 3, 1972 at page 20.

*of the City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972)), might have led to this conclusion, the Supreme Court in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), stated that "to the extent that those cases rested on or expressed a view that proof of discriminatory racial purpose is necessary in making out an equal protection violation, we are in disagreement." *Washington v. Davis, supra* at 245, 96 S.Ct. at 2050.

In regard to school desegregation cases, the Court also noted that: "The invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause." 426 U.S. at 240, 96 S.Ct. at 2048. The Court reaffirmed this principle *sub silentio* by its summary remand in *Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976).

While discriminatory effect may be relevant to a determination of segregative intent, it is conclusive on this question only in the rarest of circumstances. *See, e. g., Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

In *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977), the Court enumerated other factors which might be relevant to the question of segregative intent:

[1] The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. . . .

[2] The specific sequence of events leading up to the challenged decision also

may shed some light on the decisionmaker's purposes. . . .

[3] Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. . . .

[4] The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

Given the Court's decision in *Davis, Austin* and *Arlington Heights* as a predicate, the return of this case for reexamination was inevitable. The original decision of February, 1973 lacked the guidance of the 1976 determinations.

The Supreme Court first reviewed the substance of this Court's finding of "cumulative violations", a term which it found to be "not free from ambiguity". It noted that this Court's finding of racial imbalance in a substantial portion of the schools does not constitute "a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of the Board".[3]

It also found that the effect of optional zones pertained only to high schools, and that the rescission of certain Board resolutions to desegregate the system had significance only if there was a constitutional duty to desegregate *ab initio*. The Court then concluded that "Judged most favorably to the petitioners, . . . the District Court's finding of constitutional violation did not, under our cases, suffice to justify the remedy imposed."[4]

The Court remanded the case to this Court with the following directions:

The duty of both the District Court and the Court of Appeals in a case such as this where mandatory segregation by law of the races in the schools has long since ceased[5] is to first determine whether

---

3. *Dayton Board of Education v. Brinkman*, supra, at page 413, 97 S.Ct. at page 2772.

4. Supra, at page 414, 97 S.Ct. at page 2772.

5. It is not clear from the above statement whether such duty would differ in states where mandatory segregation has only recently been abolished. Such a distinction might reduce the precedential assistance now available to district courts.

there was any action in the conduct of the business of the school board which was intended to and did in fact discriminate against minority pupils, teachers or staff. . . . If such violations are found the District Court . . . must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted when that distribution is compared to what it would have been in the absence of such constitutional violation. The remedy must be designated to redress that difference and only if there has been a system-wide impact may there be a system-wide remedy.

While the requirement of segregative intent is not new to school desegregation cases (*Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973)), the concept of incremental segregative effect is. As explained by the Supreme Court, it stands as a more precise formulation of the principle that "the extent of an equitable remedy is determined by and may not properly exceed the effect of the constitutional violation." *Austin Independent School District v. United States*, 429 U.S. 990, 995, 97 S.Ct. 517, 519, 50 L.Ed.2d 603 (1976) (Powell, J. concurring).

■ We read this language as imposing a burden upon the plaintiffs to prove the effect of any purposeful segregative act, not merely on a theoretical basis, but on a factual basis. The necessity for such burden may be found in the following statement by Justice Powell:

The individual interests at issue here are as personal and important as any in our society. They relate to the family, and to the concern of parents for the welfare and education of their children, especially those of tender age. Families share those interests wholly without regard to race, ethnic origin or economic status. It also is to be remembered in granting equita-

ble relief, that a desegregation decree is unique in that its burden falls not upon the officials or private interests responsible for the offending action, but, rather, upon innocent children and parents. *Austin, supra*, 429 U.S. at 995, footnote 7, 97 S.Ct. at 519.

Consistent with the admonitions of the Supreme Court, a full review of all evidence and testimony has been undertaken. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court submits its Findings of Fact and Conclusions of Law.

## II

## HISTORICAL PERSPECTIVE

A. Since shortly after the 1913 flood, Dayton's black population has centered almost exclusively on the West Side of Dayton. (T.R.1–623)[6] Since that time this population has moved steadily north and west. (Defendant's Exhibit BY) Without question the prime factor in this concentration has been housing discrimination, both in the private and public sector. Until recently, realtors avoided showing black people houses which were located in predominantly white neighborhoods. (T.R.1 2040–2055) In the 1940's, public housing was strictly segregated according to race. (T.R.1 182–186) This segregated housing pattern has had a concomitant impact upon the composition of the Dayton public schools. (T.R.2–380, 382–Robert Rice)

■ B. There is little dispute between the parties concerning early practices of the Dayton school system in its treatment of black students. See Request for Admissions filed October 16, 1972 and Answers to Plaintiff's Requests for Admissions filed October 26, 1972. Many of those practices, if they existed today, would violate the Equal Protection Clause. Among them are the following:

1. Between approximately 1910 and 1920, black elementary children were taught in separate and inadequate fa-

---

6. For purposes of clarity the record produced at the hearings in November, 1972 will be identified as "T.R. 1" and the record produced at

the hearings in November, 1977 will be identified as "T.R. 2".

cilities located in the back of Garfield School. (T.R.1–619–623–Ella Lowrey)

In the 1920's black children were moved into the main brick building. However, two to three times as many black children as white children were assigned to a classroom.

These practices continued until approximately 1934. At that time only two white children were left in the main building. The white teachers were all reassigned, and the school became all black with black teachers and a black principal.

2. Until approximately 1950 the athletic programs in the high schools were substantially segregated. Blacks were required to use separate locker rooms. (T.R.1–532) Black athletic teams were not permitted to participate with white teams until 1948. (T.R.1–482, 569, 608) At Steele High School during the 1930's blacks were not permitted to use the school swimming pool, (T.R.1–2013, 2014), and at Roosevelt High School a separate swimming pool was set aside for blacks. (T.R.1–481, 532)

3. Two witnesses have suggested that black students were either encouraged or required to sit at the rear of classes at Roosevelt High School until approximately 1950. (T.R.–505, 572) Black high school students were counseled exclusively by black counselors, (T.R.1–609–610), and were discouraged from taking college preparatory courses due to the lack of job opportunities for blacks. (T.R.1–480)

We found these incidents of purposeful segregation to be "at least inhumane and by present standards reprehensible". (Findings of Fact and Memorandum Opinion of Law February 7, 1973, at page 3) While they evidence an inexcusable history of mistreatment of black students, no evidence has been presented by the plaintiffs to show that "the segregation resulting from those actions continues to exist". *Keyes, supra,* 413 U.S. at 210, 93 S.Ct. at 2698. In the absence of evidence showing their effect on "the racial distribution of the Dayton school population as presently constituted", plaintiffs have failed to meet the remedial portion of their burden of proof.

III

RACIAL IMBALANCE

As this Court noted in 1973, "the great majority of all schools in the Dayton system are racially imbalanced . . .". (Findings of Fact and Memorandum Opinion of Law–February 7, 1973 at page 5) Indeed, in 1971–72 51 of the some 69 schools in the system were virtually all-white or all-black. (Plaintiffs' Exhibit 1003) The evidence disclosed an acceleration of this phenomenon between 1959 and 1970. (T.R. 1–548, 836) During this same period of time whites were fleeing from Dayton's West Side. (T.R.1–551) Between 1951 and 1972 the percentage of blacks in the school system went from approximately 18% to 45%. (Plaintiffs' Exhibit 100E; Defendants' Exhibit CU)

Both Mr. Robert French, Superintendent of Schools from 1947 to 1958, and Mr. Ralph D. Curk, former Director of Research for the system, noted that with one exception (termed the West Side Reorganization discussed herein at pages 12–13), no attempt was made to alter the racial characteristics of any of the schools. (French Deposition at page 42, Curk Deposition at pages 47–48; 52)

Contrary to the opinion of many of plaintiffs' witnesses (T.R.1–1684, T.R.2–159–161), the failure of school officials to take affirmative steps to alleviate this racial imbalance does not become actionable under the Equal Protection Clause unless the imbalance was precipitated by their own intentionally segregative acts.

While the Supreme Court has deemed racial imbalance in the schools an important indicia of a system in which intentional acts of segregation may have occurred, *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), such imbalance alone does not establish a Fourteenth Amendment violation. *Dayton Board of Education v. Brinkman,* 433 U.S.

at page 413, 97 S.Ct. 2766. It can only be viewed in the context of evidence of intentionally segregative actions by the Board.

## IV

## FACULTY ASSIGNMENT AND HIRING

■ After a second perusal of the transcripts, depositions, and exhibits in this case, the Court considers the description in its 1973 Order concerning the three-phase policy on faculty hiring and assignment[7] to be substantially accurate. Those findings will be expanded here.

A. During the 1930's, black teachers were hired only as they were needed to teach black children. (T.R.1.–619–642)

B. The black population of the city increased during the 1940's and concomitantly more black teachers were hired. As this Court noted in its previous Order: "There is no direct evidence that black teachers were forbidden to teach white children at any school . . .". (Order of February 7, 1973 at page 1255). *See* Appendix A.

There is evidence that in 1950 there were no black teachers teaching white students in any school in the system. (T.R.1–235) Whites were hired to fill vacancies in white or integrated schools, and blacks were hired only to teach in black schools. (T.R.1–233–234)

Mr. French noted that while there was pressure from black community leaders to hire black teachers at this time, "[n]othing was ever said about the placement of black teachers. There was no demand for the placement of black teachers". (French Deposition at page 53)

C. Beginning in 1951 however, the entire Board of Education, one of whose members was black, reached an unwritten understanding that this segregative placement policy should be phased out. The substance of the new policy of integration, known as "dynamic gradualism", was that "we will move as fast as we can move tactfully, without creating polarization". (T.R.1–281)

D. Although remnants of the old policy, such as discouraging black teachers from going to all white schools (T.R.1–317; 1005–1006), and assigning black substitute teachers to black schools .(T.R.1–402–403), did continue to appear after 1960, the policy of dynamic gradualism was substantially implemented during the 1950's and 1960's.

In 1951 a black teacher was assigned to teach in an integrated classroom for the first time. (T.R.1–237) By 1963 there was at least one black faculty member in each of the high schools, and there were black faculty members in 44 of the 64 schools in the system. (Plaintiffs' Exhibit 130C) By 1969 each school had at least one black faculty member, many of the faculties were totally integrated (Defendant's Exhibit AN), and there was at least one black athletic coach in seven of the eleven high schools. (Defendants' Exhibit AP) Indeed by 1969 the Dayton school system had the most black educators and the second highest percentage (29.4%) of black educators of the twenty largest systems in the State of Ohio. (Defendants' Exhibit AQ) In addition, the administrative staff was keeping pace with this trend. (Defendant's Exhibits AK, AN, AL)

E. In March of 1969 after a Title VI Compliance Review, the Office of Civil Rights of the United States Department of Health, Education and Welfare determined that the Dayton school system was in noncompliance as to its assignment of professional staff. After a meeting with HEW officials, the Board issued a resolution to desegregate the faculty by September of 1971. Each school would be required to reflect the racial balance of the district as a whole. (T.R.1–988; Plaintiff's Exhibit 11F)

As the figures contained in Plaintiff's Exhibit 1002 (pages 65, 66) indicate, the Board substantially fulfilled this commitment by the 1971–72 school year. (T.R.1–1276)

F. The Court finds that until 1951 the Board's policy of hiring and assigning faculty was purposefully segregative. Despite the policy of dynamic gradualism, vestiges of the Board's earlier illegal practices were evident until approximately 1963. But by

7. See Findings of Fact and Memorandum Opinion of Law, February, 1973 at pages 3–4.

1969 all traces of segregation were virtually eliminated. The racial quota imposed upon the Board by HEW in 1969 edged the legal limit in requiring racial balance in all of the schools of the system. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 18–24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1972). By 1972 the system had reached an appropriate racial balance in faculty assignment. No further action by the United States District Court was required.

G. The incremental segregative effect of the Board's earlier policy must now be addressed. Many of plaintiffs' witnesses asserted that the placing of black teachers in all-black schools had the effect of identifying that school as being black, thus impacting black children into black schools. (T.R.1–365–369; 410–414; T.R.2–33; 435) According to the plaintiffs, this racial identifiability continued even after the faculty was desegregated. (T.R.1–433; 1533–35; T.R.2–33–34)

The Court believes the evidence to be to the contrary. In every specific instance brought to the Court's attention in which black faculty were assigned to black schools, the school was already identifiable as being black because of the racial population of the students.

In 1957 this was true of Weaver, Miami Chapel, Highview, Garfield, Wogaman, and Willard. (T.R.1–1489); Plaintiffs' Exhibit 130B) It was true when Garfield and Willard were closed and the students in those two all-black schools were sent to McFarlane in 1962 (T.R.1–539), and it was true of Jackson and Westwood in 1960. (T.R.1–364–365; 538)

In integrated schools such as Edison, Central, Drexel, Jane Adams, Irving, Jackson, Whittier, and Roosevelt High School, where the faculties had been all-white, racial identifiability did not turn on the assignment of one to four black teachers to staffs ranging in size from 20 to 60. (*See* Plaintiffs' Exhibit 29, 130B; Defendant's Exhibit AU)

Dr. Wayne Carle, District Superintendent from 1968 to 1972, was compelled to agree that if these schools were racially identifiable, it was because of their student composi-

tion, not because of their faculties. (T.R.2–266–267)

Assuming *arguendo* that faculty desegregation could not eliminate the racial identifiability of a school in 1972, the Court finds difficulty in understanding how an integrated faculty in all-black schools in the 1950's and 1960's could have significantly affected the identifiability of such schools.

The Court finds that the predominant factor in racial identifiability of schools is the pupil population, not the composition of the faculty of the school. (T.R.1–367–368; T.R.2–256–257) The effects of placing black faculty in schools which were already identifiably black were not significant in terms of the racial distribution of the Dayton school population as it existed in 1972.

A preponderance of the evidence does not show an incremental segregative effect of the Board's policy of hiring and assignment of teachers.

V

ATTENDANCE ZONES

A. Since 1952 the Dayton school system has operated on a strict attendance zone system of assignment. With few exceptions these zones have not been altered since 1952. (T.R.1–1482; 1590; T.R.2–265–266) For the most part Dayton's schools are "walk-ins" and are located close to the center of their attendance zones. The attendance zones themselves are geographically compact. (T.R.1–1556–1562) No evidence has been presented suggesting that attendance zones were redrawn to promote segregation.

B. The evidence discloses three major boundary changes since 1951, exclusive of boundary changes for new schools:

1. *The West Side Reorganization*

Unlike many actions of the Board, there is little dispute among the parties and witnesses that this reorganization was an experiment in integration, and was intended as such. Its purpose was to enable black students to go to an integrated rather than an all-black school if they chose to do so. (French Deposition at page 39; Curk Depo-

sition at page 61; T.R.1–978–981; 1501; T.R.2–151–155)

The substance of reorganization was as follows: In 1951 the Board had before it two alternative plans for redrawing elementary attendance zones in the West Side. Plan A contemplated slight alterations to the attendance zones and additions to the all-black Garfield and Willard schools. Plan B contemplated shrinking the district of all-black Wogaman School and expanding the attendance boundaries of Jackson (35.9% black) and Weaver (67.6% black). All-black Garfield School's boundaries were also to be diminished and the boundaries of Edison (43% black) and Irving (46.6% black) were to be expanded.

In conjunction with Plan B, six optional zones were established between 1952 and 1953. They are as follows:

| Willard | Irving | Whittier | Willard |
|---|---|---|---|
| 100% Black 1951 | 46.6% Black 1951 | 29.9% Black 1951 | 100% Black 1951 |
| Whittier | Miami Chapel | Wogaman | Highview |
| 29.9% Black 1951 | 100% Black 1953 | 100% Black 1951 | 1.7% Black 1951 |
| Edison | Jefferson | Jackson | Westwood |
| 43% Black 1951 | 0% Black 1951 | 35.9% Black 1951 | 0% Black 1951 |

(T.R.1–1457–1458; 1486; 1663–1674)

After being apprised of these alternative plans for action, leaders from the West Side community opted for Plan B. The Board of Education approved Plan B in December of 1952. (T.R.1–1873–1874)

The experiment was in fact a failure. Within three years the integrated schools involved in the plan became predominantly black. No other attempt was ever made to alter attendance boundaries for the purpose of integration. (French Deposition at 39–40; T.R.1–1500)

The plaintiffs have gone to great lengths in describing the segregative effects of this plan. Dr. Gordon Foster described the situation as "essentially one of diddling around piecemeal with desegregation . . . ."

(T.R.1–1501) The only alternative which Dr. Foster suggested was to transport children out of or into the area. (T.R.1–1505)

Whatever the effects of this reorganization may have been, its purpose was clearly integrative rather than segregative. Lack of success in an innovative plan intended to advance integration is not synonymous with segregative intent.

A preponderance of the evidence does not show a segregative intent as to the West Side Reorganization.

### 2. The Stivers Boundary Change

The redrawing of this attendance zone was necessitated by the construction of Highway 35. No question has been raised as to its intent, and its effect was integrative. (T.R.1–1255–1257; 1592–1593)

### 3. The Middle Schools

In 1971 the Board of Education altered the traditional K through 8, 9 through 12 grade structure by establishing five middle schools. (T.R.1–1306–1307) A child would attend K through 5 in an elementary school, 6 through 8 at a middle school, and 9 through 12 at a high school. The feeder elementary schools were those in the closest proximity to middle schools. (T.R.1–1308–1309)

There is evidence both that the middle schools had a segregative effect and an integrative effect. (T.R. 1–1308; 1538) There is no evidence to indicate that the schools were established with the purpose of segregating students.

A preponderance of the evidence has not shown a segregative intent in the establishment of middle schools.

C. Prior to 1950 the attendance zone system of assignment was so loosely operated that a student had little difficulty transferring to a school outside his zone. (French Deposition at page 17) While the attendance zone policy was more strictly enforced after 1950, there were exceptions to this policy. For purposes of symmetry only, the Court has grouped them into two categories: Miscellaneous Transfers and Optional Zones.

## 1. *Miscellaneous Transfers*

### A. *Shawen Acres*

From the 1930's until the early 1950's black children from Shawen Acres Orphanage were sent to the all-black Garfield School, located in a distant part of the city. (T.R.1–476–477; 511; 1230–1237) The schools surrounding Shawen Acres were at that time virtually all-white. School administrators asserted that if black children were sent to these schools, they would immediately be perceived as from an orphanage and would be ostracized by their peers. (Curk Deposition pages 54–57)

After approximately 1950 these children were reassigned to Loos, Van Cleve, Brown and Shiloh Schools, all of which were predominantly white. (T.R.1–511)

While arguably this might be termed a purposeful segregative act, the plaintiffs have failed to offer any objective proof as to its incremental segregative effect on the racial distribution of the school population.

### B. *The Opening of McFarlane School*

In 1962 the new Dunbar High School was opened and the old Dunbar High School became McFarlane Elementary School. Willard and Garfield which respectively were two blocks away and four blocks away were closed and their students were transferred to McFarlane. (T.R.1–1653)

Plaintiffs argue that the closing of these two all-black schools and the creation of a new one constituted a purposeful segregative act. If there had been an all-white school or integrated school in close proximity to McFarlane, as was the case with Barrett and Stedman Schools in *Keyes v. School District No. 1, Denver, Colorado,* 303 F.Supp. 279, 282 (D.Colo.1969), the Court might be inclined to agree. Here, however, in order to avoid an all-black school, the Board would have been forced to transport the children from the Willard and Garfield zones to schools substantial distances away. (T.R.1–1654–1660)

Viewing the circumstances as a whole, we believe that the Board's action was consistent with the policy of assigning children to the closest school.

A preponderance of the evidence does not show that such action was taken with segregative intent.

### C. *Edison School Fire*

On April 24, 1968 Edison School, which was predominantly black, was destroyed by fire. Classes of students and their teachers were sent intact to predominantly white schools. (T.R.1–583) The black children were mixed with the rest of the school population when school reopened the following year. (T.R.1–611)

Plaintiffs argue that the failure of the defendant to break up these classes of children with five to six weeks of school remaining in the year is evidence of segregative intent. Perhaps such an inference could be drawn if the condition had persisted into the following school year. The action taken was administratively sound for the short period it lasted. Since it was not continued the following year, the preponderance of the evidence does not show segregative intent.

### D. *Jefferson and Westwood Overcrowding*

In the 1969–70 school year, the school administration found it necessary due to overcrowding to transport children assigned to Jefferson and Westwood Schools to other schools, most of which were predominantly white. (Defendant's Exhibit BA; T.R.1–1322; 1975) These transfers ended after two years, when the problem of overcrowding was relieved by the middle schools. (T.R.1–1323)

Plaintiffs proffered into the 1972 record the testimony of Dr. Wayne Carle concerning the opposition of white parents whose children attended the receiving schools for the Jefferson transfers. (T.R.1–2125–2133) The Court found this testimony irrelevant in 1972, and finds it irrelevant today. What irate citizens may have said or done cannot be imputed to the Board, unless the Board was swayed by such conduct. No evidence has been presented to suggest that this was the case here.

A preponderance of evidence does not show a segregative intent as to these transfers.

E. *Stivers and Roth Transfers*

With the expansion of its boundary in 1969 and the assignment of black students to the school, Stivers experienced a number of racial disturbances. At the request of their parents, 34 black students were given temporary transfers to Dunbar or Roosevelt. (T.R.1–1259–1266)

A similar problem was encountered at Roth, where 36 white students were transferred to other schools after complaining of threats and harassment from black students. (T.R.1–1259)

The Department of Health, Education and Welfare cited these two actions as incidents of resegregation. All too often federal agencies look only to numbers and ignore realities that may exist. (T.R.1–1261) These students were transferred on an emergency basis, for one year only, and for the safety of the students involved. The record is devoid of any evidence of segregative intent as to these transfers.

F. *Freedom of Enrollment*

A review of all the evidence in this case reveals nothing which need be added to this Court's prior findings concerning the freedom of enrollment policy of the Board. Accordingly, those findings are hereby incorporated into this Order. (See Appendix A)

G. *Emergency Disciplinary, Medical and Special Education Transfers*

This Court has also examined the testimony concerning emergency disciplinary, medical and special education transfers. (T.R.1–1524–1525; 1972–1974) A preponderance of the evidence indicates that such transfers were made for legitimate rather than segregative reasons.

2. *Optional Zones*

From 1950 to 1972 the Board of Education instituted a number of optional attendance zones, which allowed children living in such zones to select from among two or more schools. The unofficial criteria for setting both attendance zones and optional attendance zones included the availability of space, distance, hazards, accessibility, and convenience. (T.R.1–1878–1879) The plaintiffs have alleged that optional attendance zones were used as a segregative tool by the board. After reviewing the optional zones which existed in 1972 and the optional zones which were eliminated prior to 1972, the Court makes the following findings:

A. *Jackson—Residence Park—Carlson*

In 1951 an optional zone was established between Residence Park and Jackson Schools. At that time Residence Park was all-white, and Jackson was 35.9% black. (Plaintiff's Exhibit 100E) Carlson School, built in 1958 was later included in this optional zone. (T.R.1–346–347) Included in this optional area was the Veteran's Administration Hospital.

Plaintiffs have alleged that this zone was established to allow white children from the Hospital to attend an all-white school. (T.R.1–1452–1454) This allegation is unsupported by evidence. All V.A. students did in fact go to Residence Park, rather than Jackson, but their numbers amounted at most to 40 white students and 8 black students in the course of 15 years. (Defendant's Exhibit CO) By 1963 all three of the schools in this option were over 80% black. (Plaintiff's Exhibit 130C) The Court finds this optional zone to be insignificant in terms of either segregative intent or effect.

B. *Roosevelt—Colonel White*

In 1951 an optional zone was carved out of the northern boundary of the Roosevelt High School attendance zone, forming roughly a rectangle bounded by Oxford Avenue to the north, Superior Avenue to the south, Salem Avenue to the east, and Rosedale Drive to the west. (T.R.1–1459; 1637–1643; 1882–1888) Roosevelt at this time was 31.5% black.

Colonel White housed only ninth and tenth grade students who then completed high school by attending Fairview High School. Both Fairview and Colonel White were 100% white in 1951. (Plaintiff's Exhibit 100E) In approximately 1957 Colonel

White became a four-year school. In 1957 the optional zone in question was extended south to Wolf Creek and a short distance west.

No single or predominant reason for the establishment or original configuration of this zone appears from the testimony. Obstacles to access, including Wolf Creek, a set of railroad tracks, a tire company, and a packing house had confronted students living in the northern portion of this zone since it was established in 1940. Students living north of Wolf Creek who wished to take public transportation to school were required to take a bus downtown and then transfer to a bus which ran along West Third Street to Roosevelt. (French Deposition page 21; T.R.1–520–521) By 1951 more direct public transportation was available to Colonel White and Fairview from this area. (T.R.1–1885)

In the final analysis the convenience of students and parents became the deciding factor in setting up the zone. (T.R.1–1888) As Mr. French stated in his deposition: "They said they couldn't see why their youngsters couldn't attend Colonel White because it was closer and that the transportation was better, and this agitation went on for a couple of years. We made a study of it and had a meeting on it and decided that it was a logical and legitimate complaint, and therefore we said the children in this area could have the choice of either going to Roosevelt or to Colonel White."

(French Deposition pages 27–28)

The Court has scoured the entire record in this case in search of some cogent evidence that this optional attendance zone was created for purposes of segregating white students from black students. No such evidence has been found. Not even the effect of the optional zone indicates such a purpose. In 1963 Colonel White was only 1.1% black and Roosevelt had become 94.5% black. Both of these figures reflect the changing racial compositions of the attendance areas which the schools serve. (Defendant's Exhibit BY; Plaintiff's Exhibit 130C)

By 1969 Colonel White was 19.3% black and Roosevelt was virtually all-black, again reflecting the composition of their basic attendance zones. By 1972 Colonel White had become 54% black. (Plaintiff's Exhibit 1003) Despite the fact that the black population of Colonel White was increasing during this time, no attempt was made to eliminate or alter the optional zones. As the estimate in Table 3 of Defendant's Exhibit DA indicates, even if the optional zone had been included in Roosevelt's attendance area, Roosevelt would still have been 87% black in 1970.

A preponderance of the evidence has not disclosed any segregative intent or effect in the establishment of the Roosevelt-Colonel White optional zone.

### C. *Colonel White-Kiser*

This optional zone was carved out of the Colonel White attendance zone in 1962. The ostensible reason for creating this zone was to shift more students to Kiser, which had traditionally been under capacity. (T.R.1–1898–1899; French Deposition page 30) The Court is unaware of any evidence which would contradict this explanation.

The effect of this optional zone on the racial composition of Colonel White was nil, since only white students lived in the zone and the racial balance at Colonel White was nearly perfect in 1972. (Plaintiff's Exhibit 15B; Defendant's Exhibit DA) Between 1967 and 1971 twenty-seven white students opted to Colonel White and 102 opted to Kiser. In the 1971–72 school year, no whites opted to Colonel White and 20 opted to Kiser.

A preponderance of evidence does not disclose any segregative intent or effect in the establishment of the Colonel White-Kiser optional zone.

### D. *Other Optional Zones*

The Court has examined the testimony on the following optional zones and has found nothing to indicate that they were established with the intent to segregate. (*See*

T.R.1–1466–1474; 1602–1615 (Westwood-Gardendale Zone); 1630–1635; 1645–1652; 1905–1917) Those which existed as of 1972 include the following:

## EXISTING OPTIONAL ZONES

| Optional Zone | Date of Creation | Percentage Black School Population at Date of Creation | Percentage Black School Population As of 1972–73 |
|---|---|---|---|
| **Elementary Schools:** | | | |
| 1. Belle Haven/ | 1955 | 0.0 | 17.7 |
| Ft. McKinley | | 0.0 | 2.6 |
| 2. Residence Park/ | 1959 | a. | 100 |
| Jane Addams | | 29.3 b. | 78.7 |
| 3. Lincoln/ | 1957 | 0.0 | 0.6 |
| Horace Mann | | 0.0 | 3.1 |
| 4. Cleveland/ | 1956 | 0.0 | 0.8 |
| Belmont Elem. | | 0.0 | 9.4 |
| 5. Grant/ | 1957 c. | 0.0 | 0.3 |
| Belmont | | 0.0 | 9.4 |
| 6. Eastmont/ | 1957 c. | 0.0 | 0.7 |
| Lewton | | 0.0 | 5.8 |
| **High Schools:** | | | |
| 1. Fairview/ | 1965 | 0.9 c. | 24.1 |
| Roth | | 53.5 c. | 95.8 |
| 2. Wilbur Wright/ | 1956 | 2.2 b. | 9.2 |
| Belmont H.S. | | 0.0 | 5.2 |

\* a. Figures not available
 b. Figures as of 1951
 c. Figures as of 1963–1964

Those which were terminated prior to 1972 include the following:

| | Date of Creation | % of Black Students As of 1960 d. | Date Terminated | % of Black Students As of 1971–1972 |
|---|---|---|---|---|
| **High Schools:** | | | | |
| Belmont | 1956 | .09 | 1969 | 2.7 |
| Stivers | | 0.6 | | 12.3 |
| Belmont | 1956 | .09 | 1969 | 2.7 |
| Wilbur Wright | | 3.5 | | 5.5 |
| **Elementary Schools:** | | | | |
| Ft. McKinley | 1960 | 0.0 | | 1.6 |
| Fairport | | 0.1 | f | 39.7 |
| Fairport | 1960 | 0.1 | | 39.7 |
| Fairview | | 1.7 | f | 7.4 |
| Fairport | 1960 | 0.1 | | 39.7 |
| Cornell Heights | | 44.2 | f | 72.3 |
| Jefferson Elem. | | 60.1 | | 91.3 |
| Cornell Heights | f | 44.2 | f | 72.3 |

\* d. Taken from Plaintiff's Exhibit 130D
 f. Date unavailable from the evidence.

| | Date of Creation | % of Black Students As of 1960 d. | Date Terminated | % of Black Students As of 1971–1972 |
|---|---|---|---|---|
| High Schools: | | | | |
| Jefferson Elem. | | 60.1 | | 91.3 |
| Brown | f | 0.6 | f | 1.0 |
| Jefferson Elem. | | 60.1 | | 91.3 |
| Edison | f | 97.3 | f | 99.7 |
| Westwood | 1957 | 94.7 | | 99.5 |
| Gardendale | | 7.9 | f | 72.3 |
| Cleveland | | 0.0 | | 0.3 |
| Lincoln | | 0.0 | | 1.0 |
| Franklin | f | 0.0 | f | 0.0 |
| Orville Wright | | 0.0 | | 6.7 |
| Kemp | f | 0.0 | f | 7.2 |
| Emerson | 1965 | 0.0 | e. | 5.6 |
| Irving | | 100 | e. | 99.5 |

\* d. Taken from Plaintiff's Exhibit 130D

e. This zone was eliminated three to four years later with the opening of Highway 35. It had virtually no students in it when it was established. (T.R.1 – 1649–1650)

f. Date unavailable from the evidence.

According to the testimony of Mr. Ralph Curk, all of these zones were established for one or more of the five legitimate reasons stated above. (T.R.1–1905–1917) No testimony was presented by the plaintiffs which would indicate to the contrary. The objective effects of these zones on the racial composition of the schools which were involved does not disclose any pattern or plan which might have been racially motivated.

The preponderance of evidence has not established any incremental segregative effect or segregative intent as to the now abandoned use of optional zones.

D. The final exception to the Board's attendance zone policy of assignment is the establishment of city-wide high schools which draw their enrollment from the entire district. Two such schools have long been a part of the Dayton system:

1. *Paul Lawrence Dunbar High School*

Named after a famous black poet who was a native Daytonian, Dunbar opened in 1933 with an all-black staff, a black principal and an all-black student body. (T.R.2–411) Throughout its history the school had an open enrollment policy, although in 1942 the 7th and 8th grade classes from Garfield and Willard were assigned to the school. (T.R.1–1519) Evidence was also presented which indicates that some black students may have had their elementary school records automatically transferred to Dunbar during the 1930's and 1940's. (T.R.1–1383) Although any student in the city could attend Dunbar, for practical purposes only blacks did. (T.R.1–1519) Indeed, black students living in the eastern-most portion of the school district traveled across town to attend Dunbar, although they could have attended schools closer to their homes. (T.R.1–497–498)

In 1962 Dunbar High School was converted to McFarlane Elementary and a new Dunbar High School was opened. While initially there were some objections by the NAACP to the site of the new school, these objections were withdrawn in 1959. (Defendant's Exhibit N; T.R.2–386–388; T.R. 2–508–512) The new Dunbar had its own attendance boundaries and open enrollment was eliminated.

There is no question that the first Dunbar High School was intended to be and was in fact a black high school. One of the

difficulties inherent in the concept of "incremental segregative effect" is the necessity to explore the "alternate universe theory", i. e., what would have happened if Dunbar had not been maintained with a district-wide enrollment. By 1940 the population surrounding Dunbar was 60% to 70% black. By 1950 it was 80% to nearly 100% black. By 1960 almost all of West Dayton was predominantly black. (Defendant's Exhibit BY) While the effects of the Board's segregative acts may have lingered into the 1940's, the ever-increasing black population in West Dayton would have resulted in Dunbar being virtually all black by 1960 even if it had had its own attendance zone. As the West Side Reorganization made apparent, nothing short of transporting students into or out of Dunbar could have integrated the school.

The effects of the Board of Education's segregative acts in 1933 were totally subsumed in the effects of five to six decades of housing segregation in which the Board played no part. We agree with Mr. Robert Rice, a Dayton historian, that "Dunbar High School, Roosevelt High School, in particular, became all black due to the segregated housing patterns". (T.R.2–380)

The Court concludes that the relationship between the Board's past segregative acts and the all-black status of Dunbar High School in 1962 has "become so attenuated as to be incapable of supporting a finding of de jure segregation warranting judicial intervention." *Keyes, supra* at 211, 93 S.Ct. at 2698.

The record does not reveal any segregative intent as to the site selection or setting of attendance boundaries for the new Dunbar High School. (T.R.1–1812)[8]

The Board of Education followed its customary policy of locating the school where it was needed, at the best available price for the land, and without regard to what the racial composition of the school would be. The fact that housing was built around the school, and that the racial composition of that housing was the same as the rest of the area around it, were events beyond the control of the Board.

The preponderance of evidence does not show any incremental segregative effect from the building and operation of the old Dunbar High School, nor any segregative intent in the building of the new Dunbar High School.

### 2. *Patterson Cooperative High School*

In 1954 Patterson Co-op opened as a three-year work-study vocational high school with open enrollment. (T.R.1–1739). From 1954 to 1968, the school was under capacity, and as of 1963 had a black enrollment of only 1.8% (Defendant's Exhibit CU) Patterson Co-op's first black teacher was not hired until the early 1960's and its first black counselor was not hired until 1968 or 1969. (T.R.1–1748–1749) Students for the school were recruited by teams of counselors who spoke to ninth grade classes in all of the high schools. Beginning in 1965 efforts were made to recruit more black students. (T.R.1–1739–1740).

In 1968 Patterson Co-op became a four-year high school, and its selection process was altered. Each elementary school's eighth grade class was allotted 8% to 10% of the total enrollment of Patterson's ninth grade class. (T.R.1–1055; 1742) In the 1967–68 school year, Patterson's black enrollment increased to 12.8%. (T.R.1–1251; Defendant's Exhibit AR) In 1970 objective criteria were incorporated into the selection process. The process was further refined in 1971–72, when the students were selected by a lottery system. (T.R.1–1056; 1744).

The preponderance of evidence does not suggest that school officials intentionally discouraged black students from attending Patterson nor that they were systematically excluded from the selection process prior to

---

**8.** A review of the testimony including that of Mrs. Miley Williamson, Executive Secretary of the Dayton Chapter of the NAACP (T.R.2–384–401), indicates at most an honest difference of opinion upon a subject open to such difference.

In addition to acquiescing finally to the site, Mrs. Williamson made no mention of any alternative to the proposed site which was presented to the Board in 1959.

1965. Mr. French noted that Patterson Co-op had difficulty in the "early days". But Mr. Nelson Whiteman, Principal of Patterson Co-op, indicated that students were not discouraged from enrolling in the school because of this problem. (French Deposition page 51; T.R.1–1763)

The racial imbalance which existed prior to 1965 was totally eliminated by 1972.

## VI

## SITE SELECTION, SCHOOL ADDITIONS, TRANSPORTABLE SCHOOLS, AND SCHOOL UTILIZATION

■ The plaintiffs have contended throughout this litigation that the Board intentionally located schools where they would become all-black or all-white when they opened or as time passed. As was noted by Dr. Foster, from 1950 to 1972 some 24 new schools were opened by the Dayton Board of Education. Of those 24, 22 opened with 90% or more black or white enrollments; seven schools opened with 90% or more black students; six schools opened with 90% or more white students; and nine schools opened with 90% or more white students, but by 1972 were between 17.7% and 96.7% black. (T.R.1–1420–1424)

In addressing this question the Court notes that the process of site selection and enrollment projection was a most imprecise science in the Dayton school system. It approached the level of haphazard in some instances. It was a basic policy to locate schools where the children already lived or were expected to live. Enrollment projections were developed through the use of plat maps obtained from city planners, through information received from public housing authorities, and through guess work as to how an area might develop. (T.R.1–1783–1785; Curk Deposition at pages 9–13)

After deciding that a new school was needed, school officials attempted to build it within walking distance of a projected development and on the most inexpensive land they could find. They also worked closely with the city recreation department so that schools could be situated near playgrounds and parks. (T.R.1–1785–1786; 1821)

The defendants presented evidence that racial considerations played no part in the site selection for any of the schools built since 1950. That evidence stands virtually undisputed by the plaintiffs. Only the site selections for the following schools have been substantially put into question: [9]

### A. Roth High School

When this school opened in 1959 it had a racial mix of 25% black and 75% white. According to Mr. Curk, an effort was made to draw its attendance boundaries in such a way that the school would be integrated. (Curk Deposition at page 52) By 1963 the school remained integrated with a 53.5% black enrollment. (Plaintiff's Exhibit 130C)

Roth High School was apparently built to relieve an expected over capacity in the high schools on the West Side, and to serve the residential area which was expanding at the western limits of the district. The particular site for the school was dictated by land costs. (T.R.1–1813–1814)

Dr. Foster correctly noted that the anticipated over-capacity of Roosevelt never materialized. (T.R.1–1596) At the time, however, the school district was in a period of growth and an area close to Roth was marked for annexation by the City of Dayton. (Defendant's Exhibit B; T.R.1–1790–1791) Although this area was not annexed, the Court cannot say that the Board's expectations were so unreasonable as to bring the defendants' explanation for the school site into question. Whatever effect Roth High School may have had in taking white students out of Roosevelt became academic by 1969, since by that time both schools had become entirely black.

9. The question of the site selection for the new Dunbar High School has already been treated, *supra*.

While Dr. Foster never intimated that Roth High School was intended to be an all-black high school, he employed his most acute hindsight in suggesting that one large school built halfway between where Roth and Meadowdale are presently located might have avoided the problem. (T.R.1–1601; 1697) Ironically, had that suggestion been followed the school might very well have been built in the vicinity of what is now a predominantly black residential area. *See* Defendant's Exhibit BY.[10]

The preponderance of evidence shows neither segregative intent, nor incremental segregative effect, nor any reasonable alternative to the site of Roth High School.

B. *Gardendale, Highview and Miami Chapel*

It is undisputed that there were three legitimate reasons for building Gardendale: First, it was intended to house the district's program for mentally retarded students; Second, it was built to relieve overcrowding at Westwood; and Third, it was built in anticipation of the annexation of the Townview area. (T.R.1–1608–1609; 1790–1791; Curk Deposition at page 91)

Plaintiffs' sole argument as to this school was that it opened with a low black enrollment. The Court finds no significance to this fact, particularly since Gardendale was 72.3% black in 1971–72. (Defendant's Exhibit CU)

Plaintiffs have urged the same argument as to Highview which was 1.7% black when it opened in 1951. Dr. Foster contended that had Highview's boundaries been moved north, it would have opened as an integrated school and would have stabilized the area. (T.R.1–1615–1620) As was previously noted, Highview was included in the West Side Reorganization. Part of the reason it became virtually all-black a few years later was because of an attempt to integrate and "stabilize" the schools in that area.

As for Miami Chapel, while Mr. John W. Harewood, former Assistant Superintendent in Charge of Administration, objected to its construction in its present location, he conceded that it was built there to relieve overcrowding in other existing schools and to accommodate the needs of students living in the area. (T.R.2–545–547)

A preponderance of the evidence does not establish segregative intent in the site selections of these three schools.

C. *The Primary-Elementary Campuses*

As a matter of Board policy, all of the primary schools in the district are placed next to elementary schools primarily because the site is already there and is convenient to the students. (T.R.1–1793)

Dr. Foster indicated that in his experience this campus set-up has been used as a segregative device. While this may have been true in other districts which Dr. Foster has examined, no evidence has been presented which indicates that that was the case in Dayton. Jackson Primary was built because of the expansion of a housing project near the school. (T.R.1–1832) The site for the Jefferson Primary was hotly disputed. Some school officials wanted it located on ten acres of land with recreational facilities in the southwest portion of the attendance area. This site was rejected for integrative reasons. (T.R.1–1795–1797) Mr. Harewood urged that it be located on a site near Princeton Park to the north of the present site. (T.R.2–506) The Jefferson Primary was finally placed next to the elementary.

The preponderance of evidence does not establish a segregative intent in utilizing primary-elementary campuses.

D. *Additions and Portables*

From 1950 to 1972 ninety-five school additions were constructed. Of those ninety-

10. The location of Roth High School typifies the classic dilemma faced by a Board of Education. If a school is located within the area it is intended to serve, the Board will be accused of creating "a black school". If it is located adja-cent thereto and the area becomes black, the Board will be accused of creating a "holding pattern" to contain blacks.
See Foster Testimony (T.R.1–1600–1601)

five, seventy-eight were made to schools which had a student population of 90% or more black or white. (T.R.1–1548) As with new schools, classrooms were added as they were needed and were used to accommodate growth in lieu of changing attendance zones. (T.R.1–1814) Portables were also used on a limited basis where schools were overcrowded. In 1972 eleven portables were located at four schools, two of which were predominantly white and two of which were predominantly black. (T.R. 1–1444–1445) The fifteen other portables used between 1966 and 1972 were similarly distributed. (T.R.1–1447)

While Dr. Foster noted that additions and portables are sometimes used as segregative devices, he offered no specific instances of such a use with an intent to segregate in the Dayton system.

### E. *School Utilization*

Plaintiffs have cited a number of schools which were under-capacity by 1972, particularly schools in the northern part of the district, such as Hickorydale, Horace Mann, Meadowdale, Shoup Mill, Valerie, and Meadowdale High School. (T.R.1–1828–1847)

As has already been noted, site selection in the Dayton school system was done on a very unsophisticated basis and some errors in judgment were inevitable. One example is Shoup Mill School, located at the northernmost part of the district. According to Mr. Curk, that school was built on the expectation that the open land immediately to the south would be developed. It was developed, but into apartments and not houses. The expected number of students for the school never really materialized. (Curk Deposition at page 25) It should also be noted that all but one of the schools listed above opened prior to 1964, the peak year of the school system's enrollment. Between 1964–65 and 1972–73, the total enrollment in the system dropped from 60,633 to 50,802 and the percentage of black enrollment increased from 31.1% to 44.6%. (Plaintiffs' Exhibits 1002; 1003)

Plaintiffs contend that the school system should have transported students from such overcrowded schools as McFarlane and Jefferson to schools in the northern part of the district which were operating at less than capacity. Citing the Touche-Ross study of the school system made in 1972, plaintiffs also contend that older schools should have been closed and students reassigned to promote integration. (T.R.1–1440–1443)

While it may have made economic sense for the Dayton school system to close schools, the wisdom of the decision not to do so is not before the Court. Our inquiry is directed to the question of whether the school board was purposefully maintaining older schools in order that they would remain all-black or was purposefully maintaining schools at under-capacity in order that they would remain all-white. No evidence has been presented to indicate that such was the case. Again the plaintiffs have failed to sustain their burden of proof under the Supreme Court's Order of Remand.

The preponderance of the evidence does not establish segregative intent in the utilization of schools.

F. The basic assertion throughout this portion of plaintiffs' case appears to be that the defendants had a duty to put schools not where the children were, but where the children should be, and that by not putting schools where children should be, the defendants have engaged in intentionally segregative acts. This was the heart of Dr. Foster's and Mr. Harewood's testimony on this question. (T.R.1–1425; T.R.2–498–500)

Dr. Carle suggested that the school system had the power and duty to deny schools to a developer whose housing subdivision was not integrated. (T.R.2–112) Presumably, under this argument the Board of Education also should not provide schools for public housing projects which were not integrated. Plaintiffs argued strenuously that the rental of space for kindergartens or primary grades in *de jure* segregated housing projects during the 1940's made the school system a partner in the public housing authority's wrongful acts. (T.R.1–150–

**1250**

170; 209) They have intimated that schools such as Miami Chapel and Jackson Primary should not have been built in close proximity to the housing projects they served, but rather should have been built somewhere else.

There is language in *Swann v. Board of Education of Charlotte-Mecklenburg,* 402 U.S. 1, 20–21, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1972) which notes the correlation between school locations and segregated housing patterns. It must, however, be considered in light of the remand in this case, which requires a showing of segregative intent as a prerequisite to imposing a remedy. Nothing in *Swann* relieves the plaintiffs of the burden of proving that school officials intended their site selections to have a segregative effect on the school population and housing patterns, and that the site selections did in fact have such a segregative effect.

Neither in 1972 nor in 1977 have plaintiffs shown that school authorities conspired with public or private developers to make the West Side all black, that they intentionally established black schools to further this goal, that they established all-white schools on the school district periphery to impact black children into the West Side, or that they closed schools which were becoming integrated. Plaintiffs instead have relied entirely upon the *theoretical* effect of the defendant's policies to show segregative intent. The Court emphasizes "theoretical" because there is an absence of evidence showing the actual effects of the defendant's site selection process on housing patterns.

This is a critical distinction that must be recognized. Plaintiffs now bear a burden of demonstrating "any action . . . which was intended to, and *did in fact,* discriminate . . . " *Dayton Board of Education v. Brinkman, supra,* 433 U.S. at page 420, 97 S.Ct. at page 2775, emphasis added.

The preponderance of evidence does not establish that defendants' policy of site selection, construction of additions, use of portables, or school utilization had a segre-

gative purpose or that such policy had an incremental segregative effect upon minority pupils, teachers, or staff.

## ACTIONS OF THE BOARD OF EDUCATION 1967–1972

█ In dealing with the question of Board action in December, 1971 and January, 1972, the Supreme Court made the following observation:

The Board had not acted to undo operative regulations affecting the assignment of pupils or other aspects of the management of school affairs, cf. *Reitman v. Mulkey,* 387 U.S. 369 [87 S.Ct. 1627, 18 L.Ed.2d 830] (1967), but simply repudiated a resolution of a predecessor Board stating that it recognized its own fault in not taking affirmative action at an earlier date. We agree with the Court of Appeals' treatment of this action, wherein that court said:

'The question of whether a rescission of previous Board action is in and of itself a violation of appellants' constitutional rights is *inextricably bound up with the question of whether the Board was under a constitutional duty to take the action which it initially took.* Cf. *Hunter v. Erickson,* 393 U.S. 385, [89 S.Ct. 557, 21 L.Ed.2d 616] (1960); *Gomillion v. Lightfoot,* 364 U.S. 339, [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). *If the Board was not under such a duty, then the rescission of the initial action in and of itself cannot be a constitutional violation.* If the Board was under such a duty, then the rescission becomes a part of the cumulative violation, and it is not necessary to ascertain whether the recission *ipso facto* is an independent violation of the Constitution. 503 F.2d 684, 697.

*Dayton Board of Education v. Brinkman,* at page 413, 97 S.Ct. at page 2772 (emphasis added)

In order to evaluate the significance of the actions of the Board of Education, the Court deems it necessary to trace the history leading up to those actions in somewhat greater detail than was done in the Order of February 7, 1973.

During the late 1960's the Board of Education was under almost constant pressure from community groups to relieve the racial imbalance existing in the schools. (T.R.1–986–987) In 1967 the Board resolved that it would seek to end racial imbalance in the schools, and established the Citizens Advisory Council to investigate the problem. As a reaffirmation of intent, Dr. Carle issued a statement to the Board of Education in August of 1968 noting the earlier efforts of the Board to integrate and setting forth positive goals for the future. With the HEW Compliance Report (Plaintiff's Exhibit 11A) and the report of the Citizens Advisory Council, (T.R.1–2018), the pressure on the Board intensified.

In November of 1969 four new members were elected to the Board. At least two of these new members ran on the ticket of Serving Our Schools Committee which was pledged to neighborhood schools and against transportation of students to achieve racial imbalance. The rest of that year was marked by constant strife among the members of the Board as to what steps should be taken. (T.R.1–1044–1047)

At the same time, the school system was in financial trouble, and numerous attempts to pass operating levies failed. On October 26, 1970 all of the members of the Board signed the following resolution: "There will be no forced busing during the term of the administration of the current school board unless it is so ordered by lawful authority". (Joint Exhibit II) As two witnesses who were on the board at that time explained, the purpose of this resolution was solely to pass a school levy. The effort failed and the November, 1970 levy was defeated. (T.R.1–2032; T.R.2–449–452)

In January of 1971 another resolution was issued which stated that there was no alternative to the neighborhood school concept. (Defendant's Exhibit BU) Again, the purpose of this resolution was to generate support both for a bond issue and for a levy to be presented in the November, 1971 election. (T.R.2–454–456)

Caught between the political equivalent of Scylla and Charybdis the Board continued to wrestle with the issue of racial imbalance. In December of 1970 the Board held a public hearing on this question. (T.R.1–2066) In January and March of 1971 the Board called upon the state Department of Education for assistance. (T.R.1–2069) On April 29, 1971 the Board established a citizens committee known as the Committee of 75. (Plaintiffs' Exhibit 9)

Predictably, desegregation was a hotly contested issue in the school board election of November, 1971. One incumbent and two new members were elected to the three available seats. The election gave the neighborhood school forces a majority on the Board. (T.R.1–1130–1134; T.R.2–245)

Those election returns set in motion the following sequence of events. On December 2, 1971 the Committee of 75 made its report to the Board. Mr. Leo Lucas, President of the Board at that time, asked Dr. Carle and his staff to prepare resolutions which would implement the recommendations of the Committee of 75. (T.R.1–1135; 1142) On the following Monday morning, December 6, 1971, Dr. Carle and his staff met to consider a draft of the resolutions prepared by Dr. Carle. Mr. Louis Lucas, plaintiff's attorney in this case, also participated in this meeting at the request of Mr. Leo Lucas. (T.R.1–1151–1152) Dr. Carle apparently had also consulted Dr. Foster prior to this time, (T.R.1–1155) and later that evening a "social affair" was held at Mr. Leo Lucas' house at which Mr. Louis Lucas, Mr. Richard Austin, Mrs. Jane Lois Sterzer, Mrs. Miley Williamson and other members of the NAACP were present. The only board members present were Mr. Lucas and Mrs. Sterzer. (T.R.1–1158–1159) Dr. Carle's testimony indicates that he had had other conversations with Mr. Louis Lucas concerning "the status of desegregation litigation around the country", and wished to have him review the resolutions so that they would be "legally in harmony with the status of desegregation as it existed in the country at that time". (T.R.1–1159–1160) The legal effect of the resolutions possibly being rescinded at a later time apparently was also discussed. (T.R.1–1160)

The three resolutions were submitted to the Board on December 8, 1971. (T.R.2–246–248; Plaintiff's Exhibits 7A, 7B, 7C) With the exception of Mr. Leo Lucas and Mrs. Jane Sterzer, no member was consulted about the resolutions prior to their submission to the Board. They were approved at the December 8th meeting and a motion for reconsideration was immediately raised. (T.R.1–1174) The Court notes that this is the same Board which two years before pledged "no forced busing" during its term, and less than one year before had seen no alternative to neighborhood schools. (T.R. 1–1120–1121; 1124–1125)

Almost immediately after the resolutions were passed, Dr. Carle contacted Dr. Gordon Foster to develop a plan for implementation of the resolutions. Dr. Foster came to Dayton on December 10th and a plan was prepared by the end of December. (T.R.1–1169) In the meantime the Board met on December 16th and December 30th in an attempt to resolve the motion for reconsideration of the resolutions. (T.R.1–1165)

On January 3, 1972, hours before the first meeting of the newly-constituted Board, Dr. Carle met with the news media and announced that Dr. Foster's plan, which would involve the potential transportation of in excess of 22,000 students, had been adopted and would be implemented. (T.R. 1–1177; 1175) Later that day the Board rescinded the resolutions of December 8th.

The Court does not believe that violations of the United States Constitution can be manufactured by political or legal maneuvering. Surely the gravity of school desegregation cannot turn on such intrigue. The Court finds that while the Board of Education accepted a moral obligation to attempt to relieve racial imbalance in the schools, it was not under a constitutional duty to reorganize the entire structure of the school system so that "no building shall have a racial composition and family income characteristics substantially disproportionate to the district as a whole". (Plaintiff's Exhibit 7C) Since the Court finds that the Board was not under a constitutional duty to take

its initial action, "the rescission of the initial action in and of itself cannot be a constitutional violation." *Dayton Board of Education v. Brinkman,* at page 414, 97 S.Ct. at page 2772, *quoting Brinkman v. Gilligan,* 503 F.2d 684, 697 (6th Cir. 1974).

VII

EVENTS OCCURRING AFTER 1976

█ In the most recent hearing on this case plaintiff cited three additional indicia of alleged segregative intent on the part of the Board of Education.

The first involves a suspension and expulsion of students occurring since this Court's Order of March 23, 1976. Plaintiffs have presented evidence which indicates that for the school year 1976–77, 1,910 white students were suspended or expelled while 3,499 black students were suspended or expelled. (T.R.2–339) No evidence was presented to indicate that black students were being discriminated against in the enforcement of school rules or that disproportionate numbers of black students were being suspended or expelled from formerly all-white schools.

Second, plaintiffs assert that there are insufficient numbers of blacks in the central office of the school administration. The testimony of Mr. Jerry Steck indicates to the contrary, since the proportion of blacks, exclusive of clerical people, has gone from 23.7% in 1973 to 40% in 1976. (T.R.2–563)

Finally, plaintiffs have raised a question concerning the administration of the pairing plan for high schools. That there has been a misunderstanding regarding this Court's Order of March 23, 1976 is clear; what is not clear nor proved is that such Order was deliberately misunderstood. There is no evidence to indicate that the racial distribution in the high schools violates this Court's Order. Accordingly, plaintiffs have not sustained their burden of proof as to these three allegations.

## VIII

## CONCLUSION

### A. *The Order of February 7, 1973 Revisited*

■ In the review of this case the Court has re-examined with care its previous findings and the evidence supporting them.

The events of the ensuing five years and the evidence presented in November of 1977 have not materially altered the validity of those findings: There are many racially imbalanced schools in the Dayton school system; acts of intentional segregation by the Dayton Board of Education ended over twenty years ago; the Dayton Board of Education created optional attendance zones that had a potential segregative effect; the Dayton Board of Education rescinded resolutions that would have corrected racial imbalance.

To the foregoing plaintiffs have added little. Evidence of segregative intent and incremental segregative effect has not been supplied. Accordingly, the Court must find that plaintiffs have failed to meet their burden of proof as now imposed by the Supreme Court of the United States.

That this conclusion differs from the one reached in 1973 is less a function of change in view and more a function of change in standard.

### B. *Recommendation*:

■ Although this Court must now decline to impose a legal duty upon the Board of Education in the absence of a constitutional violation, it does likewise decline to relieve the Board of Education of its moral obligation accepted in 1967 to reduce the racial imbalance in the Dayton schools. The means of accomplishing this are at hand. The Board may continue with paired schools, it may provide for transportation of students, or it may institute its already existing plan for magnet schools.

There is now a clear choice available to both sides: This decision can be either a beginning or an ending. If a decade of community controversy and five years of expensive, time-consuming, and divisive litigation are not enough, further excursions through the federal court system are available. Litigation, however prolonged, is not an end in itself. It is intended to settle disputes not perpetuate them. This Court's opinion in February, 1973 ended with these words: "We commend to the School Board of the City of Dayton its moral obligation to provide the highest possible level of education for all children entrusted to its care without distinction or bias or partiality.".

If this Court can do no more than to remind the parties of their obligation, it should do no less than to urge an alternate disposition of this dispute.

### CONCLUSIONS OF LAW

A. This Court has jurisdiction over this matter under 28 U.S.C. § 1343.

B. Acts of intentional segregation which ended in excess of twenty years ago are not constitutional violations in the absence of a showing of an incremental segregative effect thereof.

■ C. A policy of establishing and maintaining neighborhood schools is not in and of itself a constitutional violation.

D. Unless a Board of Education is under a constitutional duty to take certain action, a recession of such action is not in and of itself a violation of plaintiffs constitutional rights.

E. Racial imbalance in a school system is not in and of itself a constitutional violation.

F. There is a burden upon plaintiffs to establish by a preponderance of evidence both a segregative intent and an incremental segregative effect in order to establish a violation of the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs have failed to meet this burden of proof as to each allegation discussed in this Order. In view of the foregoing, the complaint herein is hereby DISMISSED. Each side shall bear its own costs.

LET JUDGMENT ISSUE IN ACCORDANCE WITH THE FOREGOING.

IT IS SO ORDERED.

Appendix A to follow.

APPENDIX A

MARK BRINKMAN, et al,
 Plaintiffs

 v.

JOHN J. GILLIGAN, Governor
of the State of Ohio, et
al,
 Defendants

Civil No. 72–137

FINDINGS OF FACT AND
MEMORANDUM OPINION
OF LAW

---

This is a school desegregation suit brought as a class action by the parents of black children attending schools operated by the defendant Dayton (Ohio) Board of Education. This Court has proper equity jurisdiction under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; see *Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954); 349 U.S. 294, 300–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and under 42 U.S.C.A. §§ 1981 and 1983, 28 U.S.C.A. § 1343.

This matter is before the Court upon the briefs, stipulations and exhibits presented by the respective parties; and upon the record adduced during expedited hearing conducted by the Court from November 13 through December 1, 1972. The limited question before the Court at said hearing was whether acts by the defendant Dayton School Board have created segregated educational facilities in violation of the Equal Protection Clause.

Having carefully examined the evidence presented, the Court, pursuant to Rule 52(a), Fed. R. Civ. P., enters the following findings of fact and memorandum opinion of law.

I

FINDINGS OF FACT

A. *Historical Perspective*

(1) The evidence presented has established isolated but repeated instances of failure by the Dayton School Board to meet the standards of the Ohio law mandating an integrated school system.[1] Such instances include a physical segregation into separate buildings of pupils and teachers by race at the Garfield School in the early 1920's, a denial to blacks of access to swimming pools in high schools in the 1930's and 1940's and the exclusion, between 1938 and 1948, of black high school teams from the city athletic conference.[2]

Prior to *Brown,* however, physical isolation of black students ended, swimming pools were no longer restricted, and black athletic teams competed on an equal basis with all other Dayton High Schools.

---

1. Section 3313.48, Ohio Revised Code, provides in relevant part that:

 "[t]he Board of Education of each city . . . shall provide for the free education of the youth of school age within the district under its jurisdiction, at such places as will be most convenient for the attendance of the largest number thereof . . . ." ·

 This has been the law of Ohio since February 22, 1887, when it was enacted by 85 Ohio Laws 34. The statute was upheld and enforced in 1888 by the Supreme Court of Ohio in *Board of Education v. State*, 45 Ohio St. 555, 16 N.E. 373, as follows:

 "Section 4008 having been repealed by the Act of the General Assembly passed February 22, 1887 (84 Ohio Law 34), separate schools for colored children have been abolished and no regulation can be made under Section 4013 that does not apply to all children, irrespective of race or color."

2. For a period in the 1930's and 1940's the Shawen Acres Orphan Home sent its black and white wards to different schools. Some white children of medical personnel of the Veterans Hospital in Dayton were bused by the hospital to "white" schools. The Dayton School Board, while not initiating these practices, condoned and assisted them.

While arguably consistent with the social mores of the times, the treatment of black children during this period was at least inhumane and by present standards, reprehensible. The practices of the Dayton School Board were also, during that period, in contravention of Ohio law as cited in n.1, *supra*. Both by reason of the substantial time that has elapsed and because these practices have ceased, however, the foregoing will not necessarily be deemed to be evidence of a continuing segregative policy.

(2) Not to be dismissed on a *de minimus* theory are the practices of the Dayton School Board with regard to the hiring and placement of its teachers. In the past thirty-odd years three separate policies have been followed. Until the decade of the 1930's, there was little, if any, hiring of black teachers. Those who were hired were used in instruction of predominately black classes. During and following World War II the black population of Dayton substantially increased. Black teachers were hired in greater number, although such teachers did not teach in schools which were predominately white. While there is no direct evidence that black teachers were forbidden to teach white children at any school, in practice few actually did. Some evidence consistent with the assumption that black educators and black principals would be more understanding, sympathetic, and inspiring to black students has been suggested to the Court.

In the 1951–52 school year, the policy of assigning black teachers only to black schools ended and black teachers were gradually assigned to white or mixed schools. By 1963, under a policy designated as one of "dynamic gradualism," at least one black teacher had been assigned to all eleven high schools and to 35 of the 66 schools in the entire system.

By 1969 each school in the Dayton system had an integrated teaching staff consisting of at least one black faculty member. In the fall of 1971, pursuant to an agreement with the Department of Health, Education & Welfare (H.E.W.), the Dayton Board of Education commenced assigning faculty in such a manner that the ratio between black and white teachers in each school substantially reflected the ratio between black and white teachers in the system as a whole. Pursuant to this agreement the teaching staff of the Dayton Public Schools became and still remains substantially integrated.

By 1969 the Dayton School Board employed more black teachers than any other of the 20 largest school districts in Ohio. At that time 28.6% of all teachers were black while 38.3% of all students were black. For the school years 1971–72 and 1972–73, blacks comprised 38% of the non-teaching, non-administrative personnel employed by the Board of Education. Employment of blacks in other positions such as skilled craftsmen, however, remains substantially below the percentage of black student population or the percentage of black teachers and black administrators.

(3) In 1933, the Paul Lawrence Dunbar High School was established. Dunbar High School was intended to be, and did in fact become, a black high school, with an all black teacher and pupil population. At the time of its creation, there were no school attendance zones in Dayton and students were permitted liberal transfers. Attendance at Dunbar was voluntary.

In the 1940's and early 1950's, after reorganization into a K–8, 9–12 grade structure, high school and elementary school attendance zones were established and enforced in Dayton. Dunbar continued to exist as a city-wide all-black high school until it closed in 1962.

B. *The Dayton Public School System Today*
(a) Racial Imbalance

(4) The great majority of all schools in the Dayton system today have student populations which are racially imbalanced, consistent with the black-white population and geographical distribution thereof as shown by the 1970 census.[3] Except at the Patter-

---

3. The 1970 census for the city of Dayton indicates 71 census tracts, 45 with a black population of less than 15%, eight with a black population between 15% and 85%, and six with a black population of 85% to 100%.

son Co-op High School, where in the past few years a concerted effort has been made to enroll more black students, no effort has been made by the school board of Dayton to balance by race the student population at any particular school. See Appendix A, *post* at 1260.

#### (b) Attendance Zones

(5) There has been presented no evidence of boundary changes that would channel blacks or whites into specific schools or would restrict blacks from attending any school. Where construction of new schools has required boundary changes, they have been rational, reasonable and within the sound discretion of the Board of Education. No irregular school zones have been created, white students have not been bused past black schools to white schools, nor have black students been bused past white schools to black schools.

(6) The Dayton School District contains 57 elementary school attendance areas. No evidence has been presented of gerrymandered boundary lines and the attendance districts are regular in shape. Boundary line changes have occurred only when new schools were constructed for the purpose of relieving overcrowding in existing ones. See Appendix A, *post*, at p. 1260.

(7) The middle school program was established on January 4, 1971. Middle schools consist of grades 6, 7 and 8. The middle school program has to date been only partly effectuated in the Dayton system. Elementary schools (kindergarten through eight) are still in operation as well as primary schools (kindergarten through five), and middle schools (six through eight). At the present time there are five middle schools in Dayton: Cornell Heights, Longfellow, MacFarlane, Whittier, and Orville Wright. For the racial compositions of these schools, see Appendix A, *post*, at p. 1260.

Attendance boundaries for the middle schools were established in September, 1971, and have neither segregative nor integrative effect.

(8) There are presently eleven high schools in Dayton, ten of which have specific attendance areas. The eleventh, Patterson Co-op High School, enrolls students from the entire district for its vocational education program. The black percentage of attendance at Patterson High School has increased due to an altering of recruitment techniques, from 2.0% in 1963 to 32.9% in 1972. No evidence has been presented that under the present selection system the admission of blacks is denied or discouraged or that the system is segregative in effect.

Dayton has constructed five high schools since 1954 and has altered attendance zones where necessary to accommodate the overcrowding of existing high schools. Other than such alterations, no attendance zone boundaries have been changed. No evidence of the establishment of high school boundary lines for the purpose of creating white high schools and black high schools has been presented.

#### (c) Site Selection and Construction

(9) Since 1954 the school board of Dayton has constructed 14 new elementary schools and 69 elementary school additions. The construction follows the pattern of growth in the Dayton area and follows the specific policy of "building schools where children are, or where they are expected to be." New construction of elementary schools was largely on the periphery of the center city. There are instances of errors in Board planning in that some areas have not developed as expected and other developed areas have not become part of the Dayton School District, as expected. There are examples of schools operating substantially below capacity. While reasonable minds might reasonably differ on selection and construction

---

While the Dayton School District is not geographically identical to the city limits of the City of Dayton, the variations are non-signifi-

cant in the context of the areas' black-white population.

of some schools, sufficient evidence has not been presented that school construction was segregative in nature other than to provide schools in white neighborhoods which remain predominately white and schools in black neighborhoods which remain predominately black.

(10) Five new high schools and fourteen high school additions have been constructed in the past eighteen years. Construction of some high schools followed the pattern of construction of elementary schools in that sites selected were away from the center of the city and in neighborhoods which were predominately white. Other sites could have been selected near the center of the city in black neighborhoods.. Such schools would arguably, at least, have had a larger proportion of whites attending such schools.

Site selection is a matter of judgment and no evidence has been presented that the Board of Education failed to use neutral criteria in its choices. In the construction of schools, the Board, over the years, has been presented with options. Plaintiffs have failed to sustain their burden of showing that the defendant Board exercised those options presented in an improper fashion.

### (d) Optional Zones

(11) The Board of Education of the Dayton School District has from time to time created optional zones. Optional zones are dual or overlapping attendance areas which allow children residing within them a choice among two or more schools. Some optional attendance zones were created where the more distant school geographically had better access; some were created where the more distant school did not require the crossing of busy intersections, commercial areas, or railroad tracks. Many were created for the convenience of parents. There has been evidence that at times this last concept embraced desires motivated by racial considerations. Seven optional elementary zones and four optional high school zones exist at the present time. All of the others have been abolished. See Appendix B, *post*, at 1261.

The majority of optional zones had no racial significance at the time of their creation. The Westwood-Jackson, Roosevelt-Colonel White, and Fairview-Roth zones may have constituted exceptions to this general rule and we cannot conclude that these did not have adverse racial effects. Similarly, although none of the elementary school optional zones today have any significant potential effects in terms of increased racial separation, the same cannot be said of the high school optional zones. Two of these zones, those between Roosevelt and Colonel White and between Kiser and Colonel White, are by far the largest in the system and have had the most demonstrable racial effects in the past.

### (e) Freedom of Enrollment

(12) By two separate actions the Board of Education has established a "Freedom of Enrollment" policy. On May 29, 1969, action was taken whereby the parents of a pupil in good standing in the Dayton Public School District could request assignment of the pupil to any school building within the district where space was available to accommodate him. Three priorities were established:

(1) Students residing within the attendance area of a school building shall have first priority to assignment to that building;

(2) Students meeting the requirements for a course available only in the particular building shall have second priority for attendance in that building;

(3) A student desiring enrollment in any building for whatever reason shall have third priority in that building, providing his enrollment will contribute to improved racial balance in that building.

The action of May, 1969, further provided that transportation would be the responsibility of the parents.

On January 3, 1972, the Board of Education resolved to continue the Freedom of Enrollment policy with the exception that the Superintendent and his staff were di-

rected to develop and submit before the start of the second semester of the 1971–72 school year a plan providing for the free transportation of the students participating in such program. Such free transportation was adopted by the Board prior to the filing of the complaint herein.

(13) Applications for transfer and dispositions thereof during the school years 1969–1970, 1970–71, 1971–72, 1972–73, are set forth in Appendix C, *post*, at 1262. There is no evidence that the Freedom of Enrollment system has been unfairly operated or that black students have been denied transfers because of their race. There is evidence that the capacity of transferee schools has been underestimated and that projections of future enrollment are substantially overestimated. A neutrally administered freedom of enrollment system might in the future reduce somewhat racial imbalance and remove community perception of "black" and "white" schools. However, as the Freedom of Enrollment system is presently constituted, its input towards that goal has been slight. Requests for transfer have at no time exceeded 1.5% of the total student enrollment.

### C. *School Board Action—December, 1971 January, 1972*

(14) At the general election in November, 1971, the electors of the school district of Dayton elected three members for a four year term commencing January 1, 1972. Issues at such election involved the matter of school attendance zones and transportation of pupils. Two incumbent members of the Board ran for reelection, one did not. One incumbent was reelected and two new members of the Board were added. On December 8, 1971, the 1971 Board met to consider resolutions dealing with transportation of students and zone attendance lines. All members present were duly elected, qualified and acting members of the Board, although two of them were so-called "lame ducks," who would not be members of the Board after December 31, 1971.

The Board adopted several resolutions. These resolutions recognized the existence of racial segregation in the Dayton schools, the role played by the Board in the creation of the racial patterns and the concomitant responsibility of the Board to eradicate these patterns through affirmative action. The types of affirmative action recognized included the elimination of the old attendance zones and the transportation of students for the purpose of achieving the city-wide racial balance of students. These resolutions, which are set forth in part in Appendix D, *post*, at 1262–1265, were adopted by the Dayton School Board by a vote of 5–2.

Immediately thereafter, one member of the Board who had voted with the majority, requested reconsideration and was improperly ruled out of order. The Board met subsequently on December 6, 1971, and January 3, 1972. At the end of the latter meeting, the Board ended its term of office and the 1972 Board took its place. On January 3, at its first meeting, the 1972 Board rescinded the resolutions passed on December 8. Since the 1971 Board had passed out of existence, the action of the 1972 Board on January 3, 1972, was not in the nature of a reconsideration but instead was a rescission of the previous action.

The right of the majority to override protected minority rights has clear limitations in our constitutional democracy. See *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); also see *Alkire v. Cashman*, 350 F.Supp. 360 (S.D.Ohio E.D.1972). The rescission in early 1972 of the resolutions adopted by the 1971 School Board constituted an independent violation of the Equal Protection Clause rights enjoyed by the black minority of Dayton. See *Bradley v. Milliken*, 433 F.2d 897 (C.A.6 1970); *Oliver v. Kalamazoo Board of Education*, 346 F.Supp. 766 (W.D.Mich.S.D.1971), aff'd. 448 F.2d 635 (C.A.6 1971).

### OPINION

An examination of the decisional law of this circuit does not provide an identifiable

category for the Dayton Public School System. Ohio law, unlike the law of many Southern states, has never mandated the separation of the races in public schools; to the contrary, since 1887 it has specifically prohibited this practice. See n.1, supra. The Dayton system is a square peg for the round holes of Memphis, Knoxville, and other southern cities.[4] It is, however, also a round peg for the square hole that is Cincinnati in *Deal v. Board of Education.*[5] In *Deal,* which dealt with an urban school system organized under the laws of Ohio, there was no finding that the actions of the school board had contributed in *any* fashion to the segregation of the Cincinnati public schools. We have not found the *Keyes* situation of the transfer of whites to remaining predominately white schools.[6] We have not found the *Bradley* altered attendance zones or the transfer programs that allowed whites to escape from identifiably black neighborhood schools.[7] We have not found the *Davis* pattern of racial discrimination.[8]

What we have found are racially imbalanced schools, optional attendance zones, and recent Board action, which are cumulatively in violation of the Equal Protection Clause. We hold that the totality of these findings require intervention by this Court under the mandate of *Brown v. Board of Education, supra.*

We do not hold that a school board may not in its wisdom determine to establish "neighborhood schools." *Gilliam v. School Board of Hopewell,* 345 F.2d 325 (4 Cir.); *Deal, supra; Goss, supra.* But an "optional attendance zone" is a limitation upon this concept and if carried to an ultimate conclusion, effectively destroys it. If a school board elects to use the neighborhood school concept, it must do so fully and completely. Where there are hazards, natural or artificial, it must so adjust the boundaries in order to protect the children it intends to educate. It may not employ optional zones either to destroy or dilute the neighborhood school concept.

In addition, there appear to be aspects of the system which may in the future become segregative in effect unless steps are now taken that will retard these undesirable tendencies. Without seeking to calibrate the degree of segregation that inheres in individual policies of the Board, we hold that these must be refashioned in such manner as to avoid such future racially disharmonious potential.

Accordingly, the Dayton School Board is hereby instructed to prepare and present to this Court within sixty (60) days a plan that will accomplish the following:

(1) Abolish all optional attendance zones presently remaining within the Dayton school system;

(2) Restate the priorities for high school attendance in the freedom of enrollment plan in order that no student of a minority race may be denied attendance at any high school in the

---

4. Compare, for example, the intransigence of the Nashville School Board in *Kelley v. Metropolitan County Bd.,* 463 F.2d 732 (C.A.6 1972). See also *Northcross v. Board of Education of Memphis,* 420 F.2d 546 (C.A.6 1970), aff'd. 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970); 444 F.2d 1179, 1184 (C.A.6 1971); *Goss v. Board of Education of Knoxville,* 301 F.2d 164 (C.A.6 1962); 305 F.2d 523 (C.A.6 1962); 406 F.2d 1183 (C.A.6 1969); 444 F.2d 632 (C.A.6 1971); *motion for implementation order denied,* 403 U.S. 956, 91 S.Ct. 2293, 29 L.Ed.2d 866 (1971); *Robinson v. Shelby County Board of Education,* 442 F.2d 255 (C.A.6 1971); *Mapp v. Board of Education of City of Chattanooga* (C.A.6 October 11, 1972), *rehearing en banc granted* (C.A.6 1972).

5. 369 F.2d 55 (C.A.6 1966); 419 F.2d 1387 (C.A.6 1969), cert. den. 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971).

6. *Keyes v. School District No. 1,* 303 F.Supp. 279, 289 (D.C.Colo.1969); 313 F.Supp. 61, 90 (D.C.Colo.1970), aff'd in part, rev'd. in part, 445 F.2d 990 (C.A.10 1971), cert. granted 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972).

7. *Bradley v. Milliken,* 338 F.Supp. 582 (E.D. Mich.1971) aff'd., Nos. 72–1809, 72–1814 (C.A.6 Dec. 8, 1972), rehearing en banc granted (C.A.6 Jan. 16, 1973). See also *Clemons v. Board of Education of Hillsboro,* 228 F.2d 853 (C.A.6 1956).

8. *Davis v. School District of Pontiac,* 443 F.2d 573 (C.A.6 1971), cert. den. 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).

Dayton Public School System and so that transfers for purpose of improving racial balance take precedence over curriculum transfers;

(3) Maintain faculty assignment policies that will reflect in each school the approximate ratio of black to white faculty throughout the district;

(4) Establish hiring policies that will enable the clerical and maintenance personnel hired by the school board of Dayton to approximate the proportion of black-to-white ratio of the Dayton School District.

The foregoing enumerated specifics shall be considered as a minimum. The plan submitted by the defendant Board shall in all other respects conform to the requirements of law. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970); *Davis v. Board of School Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1970).

Irrespective of the determination of this Court there will remain in the City of Dayton a substantial black population entitled as a matter of law to equality in education, housing, and job opportunity. No peaceful community can consist of two separate societies viewing each other with mistrust and suspicion from ever higher walls of separation. Education has been historically in our country and remains to this day, one of the primary means of overcoming barriers of class, status and occupation.

A court can only enjoin upon a school board its legal duty. It cannot reach the infinitely more sensitive moral obligation that defies legal measurement. We commend to the School Board of the City of Dayton its moral obligation to provide the highest possible level of education equally for all children entrusted to its care, without distinction or bias or partiality.

## APPENDIX A

### RACIAL COMPOSITION OF DAYTON PUBLIC SCHOOLS (1971–1972)

Elementary schools—% Black:

| No. | School | % |
|---|---|---|
| 1. | Jane Addams | 81.7 |
| 2. | Allen | 0.6 |
| 3. | Belle Haven | 5.0 |
| 4. | Belmont | 0.0 |
| 5. | Brown | 0.6 |
| 6. | Carlson | 99.0 |
| 7. | Cleveland | 0.0 |
| 8. | Drexel | 5.7 |
| 9. | Eastmont | 0.0 |
| 10. | Edison | 97.3 |
| 11. | Emerson | 6.8 |
| 12. | Fairport | 0.1 |
| 13. | Fairview Elementary | 1.7 |
| 14. | Ft. McKinley | 0.0 |
| 15. | Franklin | 0.0 |
| 16. | Gardendale | 28.5 |
| 17. | Gettysburg | 5.2 |
| 18. | Gorman | 21.1 |
| 19. | U. S. Grant | 0.1 |
| 20. | Grace A. Greene | 96.8 |
| 21. | Hawthorne | 0.0 |
| 22. | Hickorydale | 6.6 |
| 23. | Highview | 97.0 |
| 24. | Huffman | 0.0 |
| 25. | Irving | 99.0 |
| 26. | Jackson Elementary | 99.1 |
| 27. | Jackson Primary | 98.8 |
| 28. | Jefferson Ele. | 60.1 |
| 29. | Jefferson Primary | 57.1 |
| 30. | Kemp | 0.0 |
| 31. | Lewton | 0.0 |
| 32. | Lincoln | 0.0 |
| 33. | Loos | 4.6 |
| 34. | Horace Mann | 0.2 |
| 35. | McGuffey | 14.4 |
| 36. | McNary Park | 99.4 |
| 37. | Meadowdale Ele. | 8.0 |
| 38. | Miami Chapel | 99.9 |
| 39. | Patterson-Kennedy | 0.0 |
| 40. | Residence Park Ele. | 98.8 |
| 41. | Residence Park Pri. | 99.3 |
| 42. | Ruskin | 7.0 |
| 43. | Shiloh | 0.1 |
| 44. | Shoup Mill | 7.1 |
| 45. | Louise Troy | 100.0 |
| 46. | Valerie | 7.5 |
| 47. | Van Cleve | 1.1 |
| 48. | Washington | 19.4 |
| 49. | Weaver | 99.9 |
| 50. | Webster | 0.0 |
| 51. | Westwood | 99.4 |
| 52. | Wogaman | 100.0 |

Of 52 elementary schools in use as of September, 1972, 29 are more than 90% white and 15 are more that 90% black. The balance range from 19.4% to 60.1% black.

Middle schools—% Black:

1. MacFarlane .................... 99.6
2. Whittier ..................... 99.3
3. Cornell Heights .............. 80.5
4. Longfellow .................. 64.1
5. Orville Wright .............. 8.1

High Schools—% Black

1. Dunbar ......................100.0
2. Roosevelt ...................100.0
3. Roth ........................ 95.8
4. Colonel White ............... 54.6
5. Patterson Co-op. ............. 32.9
6. Fairview ..................... 24.1
7. Stivers ..................... 14.0
8. Meadowdale ................. 10.6
9. Kiser ....................... 9.8
10. Wilbur Wright ............... 9.2
11. Belmont ................... 5.2

## APPENDIX B

### EXISTING OPTIONAL ZONES

| Optional Zone | Date of Creation | Percentage of Black School At date of creation | Population 1972–73 |
|---|---|---|---|
| Elementary schools: | | | |
| 1. Belle Haven/ | 1955 | 0.0 | 17.7 |
| Fort McKinley | | 0.0 | 2.6 |
| 2. Residence Park/ | 1954 | a. | 100 |
| Jane Addams | | 29.3 b. | 78.7 |
| 3. Westwood Ele./ | 1952 | 0.0 | 99.7 |
| Jackson Ele. | | 35.9 | 99.9 |
| 4. Lincoln/ | 1957 | 0.0 | 0.6 |
| Horace Mann | | 0.0 | 3.1 |
| 5. Cleveland/ | 1956 | 0.0 | 0.8 |
| Belmont Ele. | | 0.0 | 9.4 |
| 6. Grant/ | 1957 c. | 0.0 | 0.3 |
| Belmont | | 0.0 | 9.4 |
| 7. Eastmont/ | 1957 c. | 0.0 | 0.7 |
| Lewton | | 0.0 | 5.8 |
| High schools: | | | |
| 1. Fairview/ | 1965 | 0.9 c. | 24.1 |
| Roth | | 53.5 c. | 95.8 |
| 2. Roosevelt/ | 1951 | 31.5 | 100.0 |
| Colonel White | extended 1958 | 0.0 | 54.6 |
| 3. Kiser/ | 1962 | 2.7 c. | 9.8 |
| Colonel White | | 1.1 c. | 54.6 |
| 4. Wilbur Wright/ | 1956 | 2.2 b. | 9.2 |
| Belmont High | | 0.0 | 5.2 |

a. Figures not available
b. Figures as of 1951
c. Figures as of 1963–1964

APPENDIX C to follow.

## APPENDIX C

### FREEDOM OF ENROLLMENT APPLICATIONS

| | | 1969–70 1970–71 | 1971–72 | 1972–73 |
|---|---|---|---|---|
| White applications | | 133 | 78 | 47 |
| Black applications | | 695 | 757 | 741 |
| | Totals | 828 | 835 | 788 |
| | | | | |
| White approvals | | 50 | 39 | 23 |
| Black approvals | | 421 | 460 | 460 |
| | Totals | 471 | 499 | 483 |
| | | | | |
| White disapprovals | | 83 | 76 | 15 |
| Black disapprovals | | 274 | 260 | 187 |
| | Totals | 357 | 336 | 202 |
| | | | | |
| White disapprovals (Lack of classroom space) | | 16 | 8 | 12 |
| Black disapprovals (Lack of classroom space) | | 164 | 174 | 166 |
| Total disapprovals (Lack of classroom space) | | 180 | 182 | 178 |

## APPENDIX D

### RESOLUTIONS OF THE DAYTON SCHOOL BOARD

At the December 8, 1971, meeting of the Dayton School Board, the following three resolutions were passed, each by a 5–2 vote:

RESOLUTION SEEKING JOINT ACTION TO END SEGREGATION IN EDUCATION, HOUSING AND EMPLOYMENT IN THE METROPOLITAN DAYTON AREA

WHEREAS, the Committee of 75, in reporting to this Board, has called renewed attention to the widespread racial and economic isolation of pupils in the Dayton Public Schools and in schools of the metropolitan Dayton area.

NOW, THEREFORE, BE IT RESOLVED by the Board of Education of the City School District of Dayton:

1. That this Board hereby recognizes and admits that racial and economic segregation exists in the Dayton schools because of the actions and inactions of this and predecessor boards in the establishment of attendance districts, the location and expansion of school buildings, pupil assignment practices, design of curriculum suitable to urban needs, the assignment of teachers and other staff, and the conduct of student activity programs; the past actions or inactions of the Ohio General Assembly, the State Board of Education, and other agencies of Federal, state, and local government in contributing to the development and continuation of segregated housing, education, and employment in the Dayton metropolitan area and other parts of Ohio; and the actions and inactions of lending agencies, real estate interests, employers, unions, private schools, colleges, churches, and other organizations that have reinforced segregation.

2. That this Board recognizes that past actions or inactions of the Board of

Education and residential racial segregation are interdependent phenomena.

3. That this Board recognizes that the black minority population of the Dayton metropolitan area, as illustrated by the existence of schools of opposite racial composition in districts with contiguous district lines, essentially is contained within the central city of Dayton, as a result of discriminatory practices. Such containment works against a viable integrated school system within the city, and the Board asserts that a truly effective solution is possible only through a metropolitan approach.

4. That this Board of Education recognizes that racial and economic integration of student bodies in each school is imperative to providing equal educational opportunity, a broad curriculum capable of serving the individual needs of pupils, and a democratic environment in which future citizens can be prepared to live in America's multi-ethnic society.

5. That this Board view the racial and ethnic mix of the Dayton City School District and of the metropolitan area as assets; that this population, if reflected in each school, could itself contribute to people's learning from each other; and that, as a whole, the metropolitan area represents a nearly ideal cross section of the nation that could permit schools here to become a model of American democracy in action.

6. That this Board hereby invites and urges agencies of the federal, state, and local governments and organizations of religious, business, labor, education, communications, civic service, and real estate to assist the Board in desegregation of Dayton schools and to pledge publicly their accelerated efforts to bring about desegregation in housing, education and employment throughout the Dayton metropolitan area.

7. That the Clerk of The Board be and hereby is directed to forward a true copy of this resolution to the following:

Governor of the State of Ohio

President of the State Board of Education

Speaker of the Ohio House of Representatives

President of the Ohio Senate

Montgomery County Members of the Ohio General Assembly and United States Congress

Montgomery County Commissioners

Dayton City Commissioners

Montgomery County Council of Governments

City Plan Board

Miami Valley Regional Planning Commission

Miami Valley Regional Transit Authority

Metropolitan Housing Authority

Apartment Owners Associations

Area Progress Council

Assembly of Area Councils

Chairmen of Democratic and Republican Organizations

Community Affairs Committee

Congress of Representative East Dayton Organizations

Dayton Advisory Council on Education

Dayton Area Board of Realtors

Dayton Area Chamber of Commerce

Dayton Area Junior Chamber of Commerce

Dayton Building Trades Council

Dayton Classroom Teachers Association

Dayton-Miami Valley AFL–CIO

Dayton Model Cities Planning Council, Inc.

Dayton Public Service Union

Dayton Urban League

Deans of Area Colleges of Education

 Elementary Principals Association
Metropolitan Churches United
Miami Valley Consortium of Colleges and Universities
Montgomery County Community Action Agency
Montgomery County Council of PTAs
National Association for the Advancement of Colored People
Ohio Association of Public School Employees
Presidents Club
Secondary Principals Association
Southern Christian Leadership Conference

## RESOLUTION ASKING FOR STATE ASSISTANCE TO DESEGREGATE PUBLIC SCHOOLS

WHEREAS, The Committee of 75 has recommended school integration on a metropolitan basis, and

WHEREAS, the State of Ohio has responsibility and authority for the operation of public schools, and the State Board of Education has the duty to administer the laws relating generally to the operation of the schools, and

WHEREAS, the Ohio Attorney General has ruled that the State Board of Education has the authority to restrict funding in any school district in which said Board finds as a matter of fact that racial segregation exists,

NOW, THEREFORE, BE IT RESOLVED by the Board of Education of the City School District of Dayton:

1. That this Board hereby petitions the State of Ohio and the State Board of Education (a) to obtain from Ohio Civil Rights Commission, U.S. Office of Education and such other sources as it may deem useful, data on racial isolation of faculty, staffs and pupils within and among the several school districts as presently constituted in the metropolitan Dayton area; (b) to develop guidelines and criteria as may be necessary to assure an educationally and socially viable mix of pupils, within the socio-economic characteristics of the metropolitan area as a whole; (c) to require said districts to cooperate in preparing and implementing a plan for assignment of faculty, staffs and pupils in accordance with said guidelines and criteria, and (d) to assure adequate funding from state and district sources to continue the operation of the schools and the implementation of said plans throughout the period of transition and thereafter.

2. That said plans be developed by September 1, 1972 and fully implemented not later than September 1, 1973.

3. That the Clerk of the Board forward a true copy of this resolution to the Governor of the State of Ohio, the Speaker of the House of Representatives, the President of the Ohio Senate and the President of the State Board of Education.

\*　　\*　　\*　　\*　　\*　　\*

## RESOLUTION ORDERING THE RACIAL AND ECONOMIC INTEGRATION OF PUPILS IN THE DAYTON PUBLIC SCHOOLS

WHEREAS, the Board of Education of the Dayton City School District recognizes a moral and legal duty to provide quality nonsegregated education for all students in the district, and,

WHEREAS, integrated education is vital to the achievement of quality education for all pupils, black and white, rich and poor, and,

WHEREAS, the Fourteenth amendment to the United States Constitution and the mandate of the United States Supreme Court in *Brown v. Board of Education* decision and subsequent court decisions place an affirmative duty to dis-establish the segregated attendance patterns which result in whole or in part from its actions and inactions in order to equalize educational opportunity, and,

WHEREAS, segregated educational opportunity and unequal educational opportunities for minority and poor students now exist in the Dayton public schools, and

WHEREAS, this inequality exists as a result of the acts and omissions of this Board and preceding Boards in their decisions concerning the site selection of school buildings, size of school buildings, changes and adoption of school attendance boundaries, pupil assignment practices, faculty and staff hiring and assignment practices and,

WHEREAS, this Board has requested and received reports of findings and recommendations from the State Department of Education and the Committee of 75,

NOW, THEREFORE, BE IT RESOLVED by the Board of Education of the City School District of Dayton that it is the policy of this Board that each school shall enroll pupils in a manner which substantially reflects the racial and economic characteristics of the district as a whole. The Board recognizes that implementation of this policy requires departure from past practices and requires special planning to assure a smooth transition. The Board therefore directs:

1. That the superintendent in consultation with professional staff and the representatives of employee organizations, design and implement a mandatory program of in-service education involving all staff members to prepare staff for changes in enrollments and to develop an individualized, multi-ethnic curriculum in each school.

2. That Dayton Advisory Council on Education be requested to organize a Community Involvement Advisory Committee and a Lay Citizens Financial Review Committee to advise the superintendent during the course of planning and implementing integration programs, as recommended by the Committee of 75.

3. That the superintendent be and hereby is directed to develop and implement plans for the racial and economic integration of pupils using the following guidelines and criteria:

a. Attendance districts as presently constituted are rescinded effective September 1, 1972.

b. No building shall have a racial composition and family income characteristics substantially disproportionate to the district as a whole.

c. After determination of building capacities and racial and economic characteristics of attendance areas, pupils will be assigned to a school in which such assignment would contribute to a mix as in b. above.

d. Freedom of Enrollment policy with the exception of transfers for course enrollment shall be eliminated by September 1, 1972.

e. Desegregation is to be completed by September, 1972.

f. Nothing herein shall be construed to limit the establishment of magnet, demonstration, specialized or other education complexes, provided that the sites for instruction meet the criteria in c. above.

g. Transportation shall be held to a minimum, but is specifically included as one means of implementing this policy.

4. That to the maximum feasible extent consistent with this policy statement, recommendations of the Committee of 75, are hereby adopted and may be used in planning and implementing school integration.

5. That the superintendent report on progress and problems concerning implementation of this policy at least every sixty days and that a program for continuous evaluation throughout the phases of implementation be developed by July 31, 1972.

6. That the superintendent prepare applications for supplementary financial assistance from state, federal and other sources that may become available to improve the quality of education and achieve the goals of the Committee of 75 report.